1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DONALD GEORGE FLETCHER,

11              Petitioner,                    No. 2:03-cv-00366 ALA HC

12         vs.

13   SCOTT P. RAWERS, Warden,

14              Respondent.                    <u>ORDER</u>

15   _____/

16         Pending before the Court are Donald George Fletcher's ("Petitioner") First Amended

17   Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 41), Respondent's

18   Amended Answer to the First Amended Petition (doc. 47), and Petitioner's Amended Traverse

19   (doc. 49).  Also before the Court is Petitioner's Motion to Expand the Record (doc. 51).  For the

20   reasons discussed below, Petitioner's motion to expand the record is granted.  However, his

21   application for habeas corpus relief is denied.

22                                   **I**

23         The underlying facts of this case, as taken from the California Court of Appeal's decision
     on Petitioner's direct appeal, are as follows:
24
25              On January 15, 1990, at approximately 5 p.m., [Petitioner] was
                driving a 40 foot long, 18-wheel rig westbound on Interstate 80 . . .
26              . Traffic was heavy but moving quickly, and although it was not
                snowing or raining, it had been doing so and the road was wet.

                                        1

At one location, where the downhill grade was listed as 6 percent, several witnesses observed defendant, who was driving mostly in the left lane, pull up extremely close behind other vehicles, flash his high beams until the vehicle would pull to the right-hand lane or, if the vehicle did not pull into the right-hand lane, defendant would change lanes quickly and repeat the procedure.  While so driving, [Petitioner's] speed was estimated by the various witnesses as between 60 and 80 miles per hour.

At one point, [Petitioner] pulled behind a blue Subaru station wagon containing a driver, Carole Pasari, her friend Sharon Packard, and their two sons.  Packard was reading a book when she was interrupted by Pasari who, with concern in her voice, asked Packard what she thought the truck behind them wanted.  Packard saw the truck driven by [Petitioner] was about two car lengths behind them and closing quickly.  Since defendant was going much faster than they were, Packard thought defendant would strike them within a 'second or two.'  Packard interpreted defendant's rapid alternation of high and low beams as a 'distress signal that something [was] the matter; that there was a problem.'

There were cars in front of the Subaru, the nearest about five lengths ahead, and they were slowing down with the distance closing quickly.  There were also cars in the right-hand lane, and Packard looked in the side view mirror and saw a car in the right-hand lane but she could not remember if it was 'exactly parallel or not.'  It was her impression '[t]here was no way' to pull into the right-hand lane because '[t]he cars were close together' and the road was wet and other
vehicles were moving 'at a pretty good speed.'

Packard told Pasari that they had better move over as quickly as possible.  Pasari immediately began pulling onto the left shoulder of Interstate 90 and the vehicle began to fishtail.  The vehicle flipped and struck a tree, killing Pasari and seriously injuring Packard.  Both boys also sustained injuries.  U.D. Elston, Jr., was a passenger in a Toyota traveling about 50 miles per hour westbound on Interstate 80 in the left lane.  Elston looked through the rear window and saw
the Subaru directly behind them, traveling about 60 miles per hour with the truck driven by defendant about one or two feet behind the Subaru.  As the Subaru passed, Elston thought there was a 'split second' where the Subaru could have changed into the right-hand lane, but the truck, which now occupied 75 percent of the left lane and 25 percent of the right lane, was going too fast to permit the lane change.  Elston saw the Subaru lose control and the accident occur.

Tana Hampton, another passenger in the Toyota, observed defendant following the Subaru at a distance of about two feet.  The Subaru had only a momentary opportunity to pull in the right

2

1
2
3
4
5
6
7
8
9
10
11
12
13

> lane as the Subaru passed the Toyota.  California Highway Patrol
> captain Bob Haworth, who was off duty, was driving westbound
> from Tahoe and observed defendant's manner of driving over
> several miles. Defendant would pull to within 15 feet of the
> vehicles in the left lane until they pulled into the right lane.  If
> there was a clearing in the right lane, defendant would abruptly
> change lanes.  Defendant followed the Subaru in like manner until
> the Subaru pulled off the highway and crashed.  Defendant stopped
> his rig about a quarter of a mile beyond the Subaru and Haworth
> confronted defendant.  Defendant denied any responsibility for the
> crash, stating that he merely stopped because he had observed the
> accident.
>
> Defendant, who was arrested at the scene, told Deputy Donald
> Ladd that he was traveling about 50 miles per hour, never got
> closer than within 30 feet of the Subaru, had braked when the
> Subaru's brake lights came on, and the Subaru had room to change
> into the right lane.
>
> Deputy James Metcalfe testified that in 1998, he stopped and
> arrested defendant on Interstate 80 for reckless driving, speeding
> (defendant had been traveling between 70 and 85 miles per hour),
> and following too closely.  Defendant was convicted of reckless
> driving and ordered to attend driving school.

14   On May 25, 1990, a Placer County Superior Court jury found Petitioner guilty of second

15   degree murder and reckless driving as a result of the events of January 15, 1990.  He was

16   sentenced to 15 years to life.  He appealed to the California Court of Appeal.  His appeal was

17   denied.  Petitioner then filed a petition for review with the California Supreme Court.  That

18   petition was denied.

19   Petitioner filed a petition for writ of habeas corpus in Placer County Superior Court on

20   October 13, 1998; the petition was denied on the same day.  The court stated "[t]he reason for

21   the denial is that petitioner fails to present sufficient grounds for relief as requested."  Petitioner

22   then filed a petition for habeas corpus in the California Court of Appeals' Third District.  That

23   petition was summarily denied.

24   Petitioner also filed a petition for habeas corpus with California Supreme Court.  That

25   court held that the "[p]etition for writ of habeas corpus is DENIED.  (*See In re Robbins* (1998)

26   18 Cal.4th 770, 780; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Duvall* (1995) 9 Cal.4th 464,

474; *In re Waltreus* (1965) 62 Cal.2d 218.)."  The court did not included parenthetical

explanations for its citations to *Robbins*, *Swain*, *Duvall* and *Waltreus*.

Petitioner filed an application for habeas corpus relief in this Court on February 18, 2003,

pursuant to 28 U.S.C. § 2254(a).  On August 29, 2007, the Court ordered the Federal Public

Defender appointed to represent Petitioner.  On September 27, 2007, Jennifer M. Sheetz was

substituted as Petitioner's counsel.

Since he filed his first application for federal habeas corpus relief, Petitioner has been

paroled.  However, Petitioner alleges that he continues to suffer an injury redressible by the

relief requested in the instant petition because of the conditions of his parole.  Specifically, while

on parole, Petitioner cannot vote, drink alcohol, or obtain a commercial driver's license.

*Petitioner's Response to Order Show Cause* (doc. 57).  Therefore, his case is not moot.  *See*

*Spencer v. Kemna*, 523 U.S. 1, 7-8 (1998) ("Once the convict's sentence has expired, however,

some concrete and continuing injury other than the now-ended incarceration or parole -- some

'collateral consequence' of the conviction -- must exist if the suit is to be maintained.");

*Zegarra-Gomez v. INS*, 314 F.3d 1124, 1126 (9th Cir. 2003) (stating that the collateral

consequences of a conviction "cannot be presumed").

**II**

**A**

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a

state court judgment "shall not be granted with respect to any claim that was adjudicated on the

merits" in state court unless the adjudication of the claim:

>     (1)    resulted in a decision that was contrary to, or involved an
>            unreasonable application of, clearly established Federal
>            law, as determined by the Supreme Court of the United
>            States; or
>
>     (2)    resulted in a decision that was based on an unreasonable
>            determination of the facts in light of  the evidence
>            presented in the State court proceeding.

4

1

2   28 U.S.C. § 2254(d).

3       Here, none of the California courts presented with Petitioner's state habeas petitions

4   provided a basis for their reasoning.  When this happens, a federal court reviewing a federal

5   habeas petition "ha[s] no basis other than the record for knowing whether the state court

6   correctly identified the governing legal principle or was extending the principle into a new

7   context."  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  Therefore, the Court must

8   conduct an independent review of the record to determine whether the state court's decision was

9   objectively unreasonable.  *See id.* at 982 ("Federal habeas review is not de novo when the state

10  court does not supply reasoning for its decision, but an independent review of the record is

11  required to determine whether the state court clearly erred in its application of controlling federal

12  law.").

13                                         B

14      In his amended petition, Petitioner argues that the state court's denial of his state habeas

15  petition was unreasonable on four grounds.  First, he contends that trial counsel was ineffective

16  in failing to consult with Petitioner before trial.  Second, he contends that counsel was

17  ineffective because he failed to interview witnesses "in order to ascertain facts that would assist

18  in effective cross-examination at trial and the development of a defense."  *Amended Petition* at

19  12.  Third, he alleges that counsel was ineffective in failing to interview Michael Dahlstrom and

20  failing to call him to testify at trial.  Fourth, he asserts that counsel was ineffective because he

21  failed to consult with an expert witness.  The Court will address Petitioner's third claim last.

22                                         1

23      Petitioner attached three documents to his amended petition: Petitioner's own

24  declaration; a declaration by David Allen Brooks, who declares that he represented Petitioner

25  during his state trial; and a declaration by Michael Dahlstrom, who declares that he rode with

26  Petitioner in the cab of Petitioner's truck on January 15, 1990.  Petitioner also moved to expand

1  the record to include these three declarations, along with a California Traffic Collision Report

2  from January 15, 1990, pursuant to Rule 7(a) of the Rules governing 28 U.S.C. § 2254 cases.

3        Respondent asserts that Petitioner's "attempts to add declarations to his amended

4  petition" render the amended petition unexhausted. *Amended Answer* at 2. In his amended

5  traverse, Petitioner admits that the declarations attached to his federal petition were not part of

6  his state habeas petitions. However, he asserts that the declarations corroborate the factual

7  allegations set forth in his state petitions.

8        "The exhaustion doctrine seeks to afford the state courts a meaningful opportunity to

9  consider allegations of legal error without interference from the federal judiciary. Under

10  standards established by [the Supreme Court], a state prisoner may initiate a federal habeas

11  petition '[only] if the state courts have had the first opportunity to hear the claim sought to be

12  vindicated . . . .' *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986) (citations omitted). In *Vasquez*,

13  the petitioner brought an equal protection claim, alleging that his indictment was issued by a

14  grand jury from which members of his own race had been systematically excluded. *Id.* at 256.

15  The federal district court hearing Petitioner's federal habeas petition "saw a need to 'supplement

16  and clarify' the state-court record presented for review." *Id.* at 257. "Upon authority of 28

17  U.S.C. § 2254 Rule 7, the judge directed the State to provide more figures 'demonstrating what

18  portion of the Black population in Kings County was eligible for grand jury service'" and "[h]e

19  also directed the parties to present their views regarding the application of statistical probability

20  analysis to the facts of this case, to assist him in '[focusing] on the likelihood that chance or

21  accident alone could account for the exclusion of a group from grand jury service.'" *Id.* The

22  Supreme Court held that the petitioner's claims were exhausted because "the supplemental

23  evidence . . . did not fundamentally alter the legal claim already considered by the state courts."

24  *Id.* at 260.

25

26

"A petitioner can satisfy the exhaustion requirement by providing the highest state court with a fair opportunity to consider each issue before presenting it to the federal court." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999).  In *Weaver*, "the precise factual predicate for Weaver's claim changed after the district court conducted its evidentiary hearing."  *Id.* at 364.  However,

> [t]he facts adduced at the evidentiary hearing did not 'fundamentally alter' Weaver's claim.  The factual basis for the claim remained rooted in the same incident: the bailiff's contact with the jury after it sent out its note.  As noted above, Weaver's inability to fully explore what transpired during that incident stemmed from the state courts' refusal to grant him an evidentiary hearing on the matter, rather than from any failure of diligence on his part. The legal basis for Weaver's claim, moreover, remained unchanged. Whether the bailiff's instruction was coercive because it required the jury to continue deliberating, as originally believed, or because it required a verdict on all counts, as the district court found, the underlying claim of improper jury coercion remains the same. Given the state courts' consistent refusal to grant him an evidentiary hearing, we conclude that Weaver "fairly presented" the substance of his federal claim to the state courts, and thus properly exhausted his claim within the meaning of § 2254(b)(1).

*Id.* at 364-65 (citations omitted).

In Petitioner's state petition, he alleged that his conviction should be reversed due to his trial counsel's ineffective assistance.  In particular, he argued that his counsel failed to consult with him adequately before trial, and that "the only time . . . trial counsel spent with him in preparation for his second degree murder trial was the time spent together at brief court appearances."  *Petition for Habeas Corpus Presented to the California Supreme Court* ("State Petition") at 17.  Also, he claimed that "petitioner's attorney spent no time interviewing petitioner or investigating the case."  *Id.* at 18.  Further, he alleged that "trial counsel did not inquire of any of the witnesses, including petitioner's own witness, prior to trial, as to their observations and opinions of petitioner's driving or driving conditions on the date of the accident."  *Id.* at 21.  "Although petitioner had a passenger in his vehicle at the time of the

accident who could have testified favorably regarding his demeanor, he was never interviewed, nor was he called as a witness." *Id.* "Counsel's failure to investigate cannot be viewed as strategic, but rather a complete lack of preparation." *Id.* at 22.  The petition argued that "Mike Dolstrom [sic] would have testified that petitioner was not driving in a reckless manner." *Id.* at 28.

In his motion to expand the record before this Court, Petitioner seeks to include a declaration by Petitioner, detailing the minimal contact he had with his trial counsel; a declaration by Michael Dahlstrom, who describes how Petitioner was driving on the day the accident happened; a declaration by David Brooks, Petitioner's trial counsel, who admits to delegating much of his investigatory work; and "a portion of the CHP accident report taken on the night of the accident." *Motion to Expand the Record* at 3.  This evidence stems from the same incident and factual basis described in Petitioner's state habeas petition.     The Court must also consider whether Petitioner's "inability to fully explore what transpired during that incident stemmed from the state courts' refusal to grant him an evidentiary hearing on the matter" or from "failure of diligence on his part." *Weaver*, 197 F.3d at 364. Respondent contends that the new evidence presented here cannot be considered because "the evidence was not proffered to the California Supreme Court." *Amended Answer* at 9.  In particular, Respondent claims that "when [a] state petitioner files a petition without accompanying proof that there exists competent and admissible evidence to support the facts asserted in the petition, then he has forfeited the opportunity for an evidentiary hearing." *Id.* at 12.  Respondent is incorrect.

"Under California law, an appellate court, when presented with a state habeas petition, determines whether an evidentiary hearing is warranted only after the parties file formal pleadings, if they are ordered to do so." *Horton v. Mayle*, 408 F.3d 570, 582 (9th Cir. Cal. 2005) (citing *People v. Duvall*, 886 P.2d 1252, 1258-61 (Cal. 1995); *People v. Romero*, 883 P.2d 388,

391-94 (Cal. 1994)).  In *Horton*, "the California Supreme Court summarily denied Horton's state habeas petition without ordering formal pleadings." *Id.*  As a result, "Horton never reached the stage of the proceedings at which an evidentiary hearing should be requested," and therefore did not show 'a lack of diligence at the relevant stages of the state court proceedings.'" *Id.*

The habeas petition Petitioner filed with the California Supreme Court included a request for an evidentiary hearing.  *State Petition* at 29.  Petitioner's state habeas relief proceedings ended with the California Supreme Court's summary denial of his petition.  Petitioner never reached the reached the stage of proceedings at which his request might have been renewed.  His efforts to introduce evidence were diligent.

Petitioner fairly presented the substance of his federal claim to the state courts, and exhausted his claims.[1]

---

[1]  The lack of diligence argument Respondent raises here was also raised by the respondent in *Frye v. Stokes*, 2006 U.S. Dist. LEXIS 97368, *20-27 (E.D. Cal. Dec. 1, 2006).  In response to a petitioner's attempts to seek an evidentiary hearing in his federal habeas proceedings, "Respondent argue[d] that petitioner failed to meet the California law requirements for obtaining an evidentiary hearing and therefore [did] not demonstrate[] the diligence necessary under section 2254(e)(2)." *Id.* at *20.  The court explained that "[n]ot only does respondent appear to misunderstand California law, but his analysis would require the court to conclude that a federal court petitioner may never produce evidence here unless it was also produced in state court, a conclusion not intended by the federal habeas statute." *Id.* at *20-21.  The court noted that

> [a]ccording to respondent's interpretation of California law, if the California Supreme Court determines that a petitioner fails to establish a prima facie case, then it follows that the petitioner has not sought 'an evidentiary hearing in the state court in the manner prescribed by state law' and it follows from there that the petitioner has not demonstrated diligence for purposes of section 2254(e)(2). This syllogism does not withstand scrutiny. The California Supreme Court denied summarily both of petitioner's state habeas petitions on the merits. These were merits determinations, not determinations that petitioner failed to follow requirements for seeking an evidentiary hearing. Moreover, because it did not issue an OSC in either habeas proceeding, the evidentiary hearing issue was not before the state court.  Taken to its logical extreme, respondent's analysis would mean that a federal court could only hold an evidentiary hearing if the state court held one.  The federal habeas statute contains no such

2

Petitioner moved to expand the record to include the exhibits discussed above pursuant to Rule 7 of the Rules Governing Section 2254 Cases. "Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record without holding an evidentiary hearing." *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005). "[T]he conditions of [28 U.S.C.] § 2254(e)(2) [governing the availability of an evidentiary hearing] generally apply to Petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing." *Id.* Pursuant to section 2254(e)(2), "a claimant who 'failed to develop the factual basis of a claim in State court proceedings' will not be permitted to supplement the record in federal court unless the claim relies on (1) 'a new rule of constitutional law,' made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or 'a factual predicate that could not have been previously discovered through the exercise of due diligence'; and (2) 'the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.'" *Brown v. Farwell*, 525 F.3d 787 (9th Cir. 2008).

However, "[a]n exception to this general rule exists if a Petitioner exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings." *Cooper-Smith*, 397 F.3d at 1241; *Williams v. Taylor*, 529 U.S. 420, 437 (2000) ("[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).").

---

> requirement. Provisions in the habeas statute for discovery, expansion of the record, and evidentiary hearings show that evidence not presented to the state court may be accepted in federal court.

*Id.* at *22-23 (citations omitted).

As explained above, Petitioner was diligent in his attempt to introduce evidence in his state habeas proceedings.  However, his petition never advanced to the point where he could renew his request for an evidentiary hearing.  Because he was diligent, he is not subject to section 2254(e)(2)'s restrictions, and the Court will grant his motion to supplement the record.

The Court "must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness."  Rule 7(c) of the Rules Governing Section 2254 Cases.  Petitioner attached the exhibits he sought to introduce pursuant to Rule 7 to his motion to expand the record.  Respondent was afforded an opportunity to review the exhibits, and filed a substantive response to Petitioner's motion.  *See Respondent's June 11, 2008 Status Report* (doc. 54).  Therefore, Respondent has had an opportunity to admit or deny the exhibits' correctness.

3

Petitioner's federal habeas petition includes a request for an evidentiary hearing.  *See Amended Petition* at 5.

> [F]or a post-AEDPA petitioner to receive an evidentiary hearing in federal court, he must first show that he has not failed to develop the factual basis of the claim in the state courts: if he has failed, he must meet one of the two narrow exceptions stated in the statute. See 28 U.S.C. § 2254(e)(2)(A) - (B). Then he must meet one of the [*Townsend v. Sain*, 372 U.S. 293 (1963)] factors and make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief.

*Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005).  Petitioner never explains the legal basis for his entitlement to such a hearing, and appears to have abandoned his attempt to secure an evidentiary hearing and decided to move to expand the record instead.  Without more information regarding Petitioner's request, the Court cannot determine whether Petitioner is in fact entitled to an evidentiary hearing.  Therefore, Petitioner's request for an evidentiary hearing is denied.

C

11

1      Petitioner's entitlement to habeas relief "turns on showing that the state court's resolution

2  of his claim of ineffective assistance of counsel" under *Strickland v. Washington*, 466 U.S. 668

3  (1984), "'resulted in a decision that was contrary to, or involved an unreasonable application of,

4  clearly established Federal law, as determined by the Supreme Court of the United States.'"

5  *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting 28 U.S.C. § 2254(d)(1)).  "Ineffective

6  assistance under *Strickland* is deficient performance by counsel resulting in prejudice."  *Id.*

7  "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but

8  for counsel's unprofessional errors, the result of the proceeding would have been different.  A

9  reasonable probability is a probability sufficient to undermine confidence in the outcome.'"

10  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (citation omitted).

11                                                1

12      According to Petitioner, the prosecution's theory that Petitioner committed second degree

13  murder relied on proof of implied malice.  Petitioner contends that "evidence of Petitioner's

14  prior reckless driving conviction and driving on a suspended license constituted evidence of

15  Petitioner's subjective awareness of his recklessness, and evidence that Petitioner's driving was

16  so dangerous that it constituted an indifference to life."  *Amended Petition* at 9.  "At least since

17  1981 . . . California has followed the rule in vehicular homicide cases that 'when the conduct in

18  question can be characterized as a wanton disregard for life, and the facts demonstrate a

19  subjective awareness of the risk created, malice may be implied.'"  *People v. Ortiz*, 109 Cal.

20  App. 4th 104, 109-110 (1st Dist. 2003).  In such cases, the crime charged is implied malice

21  second degree murder.  *Id.* at 110 ("'[M]alice may be implied when [a] defendant does an act

22  with a high probability that it will result in death and does it with a base antisocial motive and

23  with a wanton disregard for human life.'").  "'[A] finding of implied malice . . . depends upon a

24  determination that the defendant actually appreciated the risk involved, i.e., a subjective

25  standard.'" *Id.*

26

Petitioner first claims that his trial counsel was ineffective because counsel "never personally interviewed him to ascertain the pertinent factual issues related to his case." *Id.*at 11.

As to prejudice, Petitioner alleges that trial counsel's

> failure to conduct an adequate pretrial investigation had a clear negative impact on the outcome of the trial, as this left the defense without any retort to the prosecution's evidence of implied malice. Had the jury been presented with the most basic defense related to Petitioner's subjective knowledge or evidence of intervening factors that lead to the accident, there is a reasonable probability that the jury would have reached a different result.

*Amended Petition* at 16.  Petitioner contends that "[i]n an attempt to discuss and prepare a defense for his trial, Petitioner made telephone calls to Mr. Brooks on several occasions. Petitioner called Mr. Brooks to discuss potential witnesses and factual circumstances that might be used as a defense." *Amended Petition* at 9.

In support of these claims, Petitioner cites to his own declaration.  That declaration reiterates Petitioner's efforts to contact his trial counsel.  It does not contain information that might rebut an implied malice defense, or "subjective knowledge or evidence of intervening factors that lead to the accident."  "[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 668.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*  Petitioner's allegations of prejudice are conclusory.  Petitioner has not presented what sort of evidence would have been uncovered if trial counsel had interviewed him; therefore, he has not shown that the result of his trial would have been different but for counsel's failure to interview him before trial.

2

Petitioner next claims that trial counsel was ineffective because he failed to interview prosecution witnesses.  Petitioner asserts that because there was no evidence that Petitioner's truck struck the victim's car, "the prosecution presented a second-degree murder theory based

13

upon implied malice. This theory depended upon the jury finding that the victim's act of veering off of the road was the natural, logical consequence of Petitioner's driving, and that Petitioner had knowledge of this fact." *Amended Petition* at 13.  Petitioner argues that the facts counsel would have uncovered would have assisted in effective cross-examination "and the development of a defense." *Id*. at 12.

First, Petitioner claims that trial counsel should have interviewed Sharon Lynn Packard, who was a passenger in the car driven by Carole Pasari at the time of the accident underlying this case.  He contends that "Mr. Brooks did not interview her prior to trial to ascertain whether her testimony might be used to explore the possible misunderstanding that may have been the source of panic that was at least partially the source of the accident that followed." *Id.*

Second, Petitioner claims that trial counsel should have interviewed other prosecution witnesses who testified that "they changed lanes when approached by Petitioner's truck with flashing lights." *Id*.  Petitioner alleges that had these individuals been interviewed by trial counsel, "it is possible that he could have solicited testimony form these witnesses regarding their interpretation of Petitioner's flashing lights." *Id.* at 14.

Third, petitioner asserts that "trial counsel did not investigate the underlying facts sufficiently to cross-examine witnesses regarding other factors which may have played a role in the accident." *Id*.  Had these witnesses been interviewed, Petitioner alleges, "the defense may have found that there were witnesses who were able to provide corroborating testimony regarding [malfunction of the spray reduction mechanism on Petitioner's] truck." *Id.*

Petitioner's claims of prejudice are conjectural.  He asserts that counsel "may" have uncovered facts that would have changed the outcome of Petitioner's trial.  Petitioner does not himself assert the facts that trial counsel might have uncovered.  Petitioner has not affirmatively proven prejudice, but has hypothesized that certain facts not presented here might have changed the outcome of his trial.

3

Petitioner contends that trial counsel's failure to consult an expert witness was also ineffective assistance of counsel.  He argues that "had the jury been presented with the most basic defense based upon other potential intervening factors which contributed to the accident, evidence from an expert witness could have countered the prosecution's charge of Petitioner's subjective knowledge that the accident was the reasonable outcome of his reckless driving." *Amended Petition* at 25.  However, Petitioner does not proffer any kind of expert witness himself, or suggest that one would testify on his behalf at an evidentiary hearing.  He also fails to present the kind of evidence such a witness would provide.  He has failed to allege sufficient facts to establish prejudice on this ground.

4

Petitioner argues trial counsel was ineffective for failing to call Michael Dahlstrom as a witness.  In his declaration, Dahlstrom states he accompanied Petitioner "in the cab of his truck on January 15, 1990" and that he "witnessed the events that occurred that day."  Had he been called to testify, he would have stated that

> [o]n the afternoon of January 15, 1990, [Petitioner] and I were driving from Reno, Nevada, to Modesto, CA.  We were late leaving Reno, so we were in a hurry was [sic] we came down the mountain.  As we came down from the summit, Don was driving fast, probably faster than we should have been.  When we approached cars in the fast lane that were slower, we would approach the car and signal for them to move over and let us pass by flashing the headlights.  While we were driving fast, I was relaxed and I did not feel that Don was driving recklessly.  At no point prior to the accident did I fear my safety or for the safety of others.
>
> . . . At one point, we approached a car in the fast lane.  We rode behind the car, getting close to the rear of the car.  As we neared we flashed the headlights, and it appeared that the driver panicked.

. . . . I was shocked when the car veered off of the road- in part because I remember there being room for the car to move over to the slower lane.  In any case, were not going to hit the car.  We would have just slowed up if the car didn't change lanes to the slow lane.  I still, to this day, do not understand why the accident happened.

Dahlstrom also explained that "[p]rior to [Petitioner's] trial, I received a call from someone working on his defense.  I was asked whether or not I would be willing to testify in Don's defense.  I told the person that I would definitely be available to testify on Don's behalf.  No one ever called me again."  Also, "[i]n the years since Don's trial, I have always felt guilty that I was not able to testify on his behalf.  I never understood why no one called me to testify."

To prove implied malice, the prosecution had to demonstrate that Petitioner had a subjective awareness of the risk his conduct created.  *Ortiz*, 109 Cal. App. 4th at 110.  Petitioner alleges that Dahlstrom's testimony would have rebutted this theory.

The first question is whether counsel's failure to call Dahlstrom constituted performance that "fell below an objective standard of reasonableness."  *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003) (internal quotation marks omitted).

In *Riley*, the petitioner claimed that "he was denied effective assistance of counsel because his lawyer Clower did not interview a key witness, Edward Pettis, and as a result, did not introduce Pettis's testimony at trial." *Id.* at 1317.  Pettis's testimony would have rebutted the prosecution's argument that petitioner was the first aggressor in the confrontation underlying his assault conviction, and would have supported his claim that he acted in self-defense.  Counsel's performance was objectively unreasonable because he never spoke with Pettis, and therefore "could not have fully assessed Pettis's version of the events, Pettis's credibility and demeanor, or any other aspect of his involvement that might have reinforced Riley's defense." *Id.* at 1318-19.  The record included no reason for counsel's decision to contact Pettis. *Id.* at 1319.  "[W]here . . . a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if

16

1   he interviews the witness" because "[a] lawyer who interviews the witness can rely on his

2   assessment of their articulateness and demeanor-factors we are not in a position to second-

3   guess." *Id.* at 1318 (internal quotation marks omitted).

4           Here, as in *Riley*, trial counsel failed to contact Dahlstrom, an eyewitness whose

5   testimony would have challenged the prosecution's theory that Petitioner drove recklessly, a key

6   aspect of their case.  As a result, his decision to not call Dahlstrom as a witness cannot be

7   justified as a tactical decision because counsel did not have the requisite knowledge to determine

8   if Dahlstrom would have been a useful witness.  *See Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir.

9   Cal. 2002) ("The failure to investigate is especially egregious when a defense attorney fails to

10  consider potentially exculpatory evidence.").

11          That Petitioner's trial counsel had his own investigator interview Dahlstrom is not

12  dispositive.  In *Riley*, counsel "made some investigation (he met with his client Riley at least),"

13  but "did not follow up with Pettis after Riley told counsel Pettis had been with him when the

14  dispute [at issue in the case] erupted."  352 F.3d at 1319.  Even though trial counsel's

15  investigator contacted Dahlstrom, counsel failed to follow up with the witness himself.  In *Riley*,

16  as here, the record does not explain why counsel failed to contact Dahlstrom.  Trial counsel's

17  failure to contact Dahlstrom was unreasonable.

18          "In evaluating prejudice . . . 'ineffective assistance claims based on a duty to investigate

19  must be considered in light of the strength of the government's case.'"  *Rios*, 299 F.3d at 808-

20  809.  "[T]he State's case against Rios was at best a close one."  *Id.* at 810.  Armed with that

21  understanding of the state's case, the *Rios* court considered whether "there [was] a reasonable

22  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

23  been different."  *Id.* (quoting *Strickland*, 466 U.S. at 694).  "A 'reasonable probability' is a

24  'probability sufficient to undermine confidence in the outcome.'"  *Id.*  Even if the omitted

25  testimony had come in at trial, "[i]t [was] possible that the State might still have been able to

26

17

obtain a conviction by exploiting inconsistencies in the different accounts of the shooting or by convincing the jurors that they should still believe the even more inconsistent testimony of the three young intoxicated women in Rios's car." However, the court's confidence in the verdict was undermined because "there can be little doubt that the [omitted testimony] 'would have altered significantly the evidentiary posture of the case.'" *Id.* at 813.

Similarly, in *Riley*, the performance was found to be prejudicial because the witness who was not called to testify by the defense would have supported the petitioner's claim that he acted in self-defense. Without that testimony, only the petitioner himself testified that he acted in self-defense. Omitting the testimony was prejudicial because the testimony "would have created more equilibrium in the evidence presented to the jury." *Id.* at 1321 (internal quotation marks omitted).

Here, Petitioner asserts that Dahlstrom's testimony was "strong enough that the failure to present this evidence for the jury's consideration undermines confidence in the outcome." *Amended Petition* at 21. He argues that Dahlstrom's testimony "would have countered the prosecutions' charge of Petitioner's subjective knowledge and could have bolstered evidence that the victim's mistaken interpretation of Petitioner's flashing headlights contributed to the accident." *Id.* However, unlike the testimony in *Rios*, it is not clear that Dahlstrom's testimony "would have altered significantly the evidentiary posture of the case." Although Dahlstrom would have testified that he did not think that Petitioner was driving recklessly, he also would have testified that "[w]e were late leaving Reno, so we were in a hurry was [sic] we came down the mountain. As we came down from the summit, Don was driving fast, probably faster than we should have been. When we approached cars in the fast lane that were slower, we would approach the car and signal for them to move over and let us pass by flashing the headlights." Also, he would have stated that "[a]t one point, we approached a car in the fast lane. We rode

behind the car, getting close to the rear of the car.  As we neared we flashed the headlights, and it appeared that the driver panicked."

Dahlstrom's testimony about the speed at which Petitioner was driving, and that Petitioner approached the rear of a car in front of the truck and flashed his headlights instead of slowing down would have bolstered the prosecution's theory that Petitioner was going too fast, and therefore had some subjective awareness that his conduct put the lives of others at risk. Dahlstrom's testimony would not have "created more equilibrium in the evidence presented to the jury" as it did in *Riley*.  At best, the testimony would have left the equilibrium unchanged, as it contains information that is both favorable and unfavorable to Petitioner.  At worst, the testimony would have aided the prosecution's case.  The Court cannot find that there is a reasonable likelihood that it would have changed the outcome of the case.

Additionally, the state's case against Petitioner was not a close one.  Several eye witnesses testified that Petitioner was driving recklessly.  For example, Robert Haworth testified that shortly before the accident underlying this case, Petitioner's truck passed him in the right lane (Haworth was driving in the left).  TR 294.  Haworth stated that

> over the course of the next couple of miles I kept watching the truck change lanes several times back and forth.
>
> Again, there was quite a bit of traffic, but it wasn't congested as far as the amount of vehicles on the road, but . . . the truck would always seem to go back into the right land when the traffic was clear, but every time it did it would run up on the back of a car, that was in front of it what appeared to be a very close distance a matter of – estimating anywhere from five to twenty feet.  I am not sure because it was in front of me.
>
> Then as the traffic was clear in the next lane, it would change to the fast lane and back and forth again several times.

TR 294-95.

David Tate was also driving on the same stretch of Interstate 80 around the time of the accident, and Petitioner, driving his truck, forced him out of the lane Tate was in. Tate testified that while driving in the left, or fast lane, of the interstate, he noticed flashing lights behind him. TR 333. He noted that "it certainly appeared that the truck was right on the tail of my car." TR 334. He stated that "the grill of the truck and the lights . . . [were] almost right up against the rear of the car." *Id.* In response to the truck's close proximity to his vehicle, Tate testified that he

> immediately determined that I had to take some kind of action in order to avoid being run over by the truck, and as best I can recall there was traffic on the righthand side lane, which prevented me from immediately swinging over to the righthand lane to allow the truck to proceed passed [sic] me, so I had to speed up at one time, and I looked at the speedometer and I recall seeing I was going about seventy miles an hour.

TR 335.

After the truck passed Tate, he testified that the truck "continued at a very high speed . . . . eighty [miles per hour]." TR 339. He testified that he witnessed the truck approach at least six other cars in a similar fashion. TR 340.

Mary Jane Spencer, a passenger in David Tate's car, testified that Petitioner's truck approached at a very fast rate, so fast that it was "frightening." TR 375. She stated that "I knew we had to get out of the way." *Id.* Flora Janigian rode in the backseat of David Tate's car on the day in question. She testified that Petitioner's truck came within four to five feet of the rear of Tate's car. TR 392. She stated that "Petitioner was flashing his lights on an off, high beam." TR 395. She testified that Petitioner approached other cars in a similar fashion. TR 397. Similar testimony was offered by Patrick Benton, who was a passenger in a different car that was also approached by Petitioner's truck. TR 406-11.

U.D. Elston also testified. He was a passenger in a car driven by his friend. Around the time of the accident, the car he rode in was in the left, or fast lane. Before the accident

1   happened, he saw the victim's car and Petitioner's truck behind the car he was in "and they were

2   coming up behind us pretty fast." TR 528.  He stated that traffic was heavy.  TR 530.  He

3   estimated that Petitioner's truck was within one foot of the victim's car.  TR 531.  He testified

4   that the victim's car tried to move over into the right, or slow lane, but could not because "there

5   were other cars there."  TR 535.  Tana Lee Hampton, another passenger in the car U.D. Elston

6   rode in, provided similar testimony.  TR 552-554.  Hampton stated that the victim could not

7   change lanes when Petitioner's truck was behind her because there were cars in the slow lane.

8       Sharon Packard rode in the victim's car during the accident.  She testified that when

9   Petitioner's truck approached the victim's car, traffic was heavy, and "[t]he truck was coming

10  very fast.  He was very close, about two car lengths.  Obviously the distance was closing, and his

11  headlights were going off and on."  TR 586.  She stated that "he was coming so fast that I felt

12  that between a second or two he was going to hit us."  *Id.*  She stated that right before the

13  accident, the victim could not have merged into the right lane (they were in the left).  TR 588.

14      To overcome this evidence, Petitioner's counsel would have had to present much more

15  than Dahlstrom's testimony which, as explained above, is arguably weak.  The state's case was

16  strong, and the inclusion of Dahlstrom's testimony would not have had significant effect on the

17  impact of the evidence, that overwhelming supported a finding that Petitioner was reckless.  The

18  Court cannot say that counsel's failure to interview Dahlstrom and call him as a witness was a

19  prejudicial decision.

20      Remarkably, Respondent concedes that Petitioner has demonstrated that Dahlstrom

21  would have testified, and that the content of his testimony would have changed the outcome in

22  Petitioner's trial.  *See Amended Answer* at 19.[2]  Instead, Respondent argues that Petitioner has

23

24  _____

25  [2] "Petitioner has the burden to disclose the identity of potential witnesses, to show they
    would have testified, and to show what the testimony would be and how it would change the
26  outcome."  Amended Answer at 19 (citations omitted).  **With the addition of Dahlstrom's
    declaration (assuming for the sake of argument it is admissible here) Petitioner does so**."

not shown that Dahlstrom's testimony would have affected the trial's outcome because

"Respondent has read the record and finds no mention of the name Michael Dahlstrom, or any

mention of Petitioner having a passenger in his vehicle." *Id*. The Court construes this as an

argument that the failure to call Dahlstrom as a witness was not a prejudicial error because it is

unclear if Dahlstrom was in fact riding with Petitioner when the accident happened as

Dahlstrom's name does not appear in any official document associated with the accident.

A copy of the collision report prepared at the scene of the accident, admitted into the

record as a result of Petitioner's motion to expand the record, identifies Dahlstrom as a

passenger "in sleeper." Dahlstrom's own declaration states that he accompanied petitioner in

"the cab of his truck" on the day of the accident. Respondent has not challenged the substance

of these two pieces of evidence, and the Court has rejected Respondent's argument that the

record should not be expanded to include them. The Court concludes that there is no question

that Dahlstrom was a passenger in Petitioner's truck on January 15, 1990. However, for the

reasons stated above, the Court rejects Respondent's concession that Petitioner demonstrated

that had Dahlstrom testified, the outcome in Petitioner's trial would have been different.

The state court decisions adjudicating Petitioner's state habeas petitions were

unaccompanied by any explanation. After reviewing the record, the Court finds that Petitioner

has not established that the state courts' decisions rejecting his ineffective assistance of counsel

claims were decisions based on erroneous applications of federal law, or that the state decisions

were objectively reasonable. *See Delgado*, 223 F.3d at 982 (explaining that when "a state court

decision . . . is unaccompanied by any ratio decidendi" the reviewing federal court must conduct

an independent review of the record to determine whether the state court's decision was

objectively unreasonable because it was based on an erroneous application of controlling federal

law).

_____

*Id*. (emphasis added).

1        IT IS HEREBY ORDERED that Petitioner's motion to expand the record is granted.

2   Petitioner's amended petition for habeas corpus relief under § 2254 (doc. 41) is denied.

3   ///

4   DATED: June 27, 2008

5

6                                    /s/ Arthur Alarcón
7                                    UNITED STATES CIRCUIT JUDGE
8                                    Sitting by Designation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26